AO 91 (Rev. 11/11) Criminal Complaint

AUSA Rebekah Holman (312) 469-6233

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**

JAN 19 2018

UNITED STATES OF AMERICA

v.

JAVIER NUNEZ ROCHELL

CASE NUMBER:

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**18 CR          37**

### CRIMINAL COMPLAINT

MAGISTRATE JUDGE MASON

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about January 18, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a) | possessed with the intent to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance |

This criminal complaint is based upon these facts:

 _X_  Continued on the attached sheet.

_____
ALISON TEEVAN
Task Force Officer, Drug Enforcement
Administration (DEA)

Sworn to before me and signed in my presence.

Date: January 19, 2018

_____
*Judge's signature*

City and state: Chicago, Illinois

MICHAEL T. MASON, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS $\Big\vert$ ss

## **AFFIDAVIT**

I, ALISON TEEVAN, being duly sworn, state as follows:

1.     I am a Task Force Officer with the Drug Enforcement Administration ("DEA"), and have been so employed since November 2017.  I am currently assigned to the Chicago Field Division.  As a Task Force Officer, I have received specialized training in the means and methods by which individuals and drug trafficking organizations conduct their illegal drug trafficking activities, and in the use of various investigative techniques used to uncover unlawful drug trafficking.  I have also participated in multiple investigations involving illegal drug trafficking.  In addition to my current assignment with the DEA, I am employed as a detective with the Mount Prospect Police Department, and have been so employed for approximately 11 years. My duties include the criminal investigation of felony cannabis, controlled substance, and narcotic offenses.

2.     This affidavit is submitted in support of a criminal complaint alleging that Javier NUNEZ ROCHELL has violated Title 21, United States Code, Section 841(a). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging NUNEZ ROCHELL with possession with intent to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin, I have not included each and every fact known to me concerning this investigation. I have set forth only

the facts that I believe are necessary to establish probable cause to believe that NUNEZ ROCHELL committed the offense alleged in the complaint.

3.    This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, surveillance, criminal history records, information from persons with knowledge regarding relevant facts, including a confidential source ("CS1"), and my training and experience and the training and experience of other law enforcement agents with whom I have consulted.[1]

4.    In early January 2018, CS1 told law enforcement agents about a narcotics trafficker s/he knew as "Javier Cabrales." Agents later identified Cabrales as NUNEZ ROCHELL. CS1 told agents that s/he had known Cabrales for several years, and knew him to be an "old school" drug trafficker who distributed large quantities of narcotics. CS1 informed agents that Cabrales had recently offered to sell CS1 two kilograms of heroin.

5.    On January 7, 2018, CS1 told agents that CS1 had used phone number (815) 603-7907 to communicate with Cabrales. CS1 told agents that Cabrales had offered to sell CS1 heroin and they had been negotiating a price for the heroin over the phone. During the conversations about the heroin, NUNEZ ROCHELL used (815)

---

[1] CS1 is providing information in this investigation in exchange for consideration on his/her pending case. CS1 has a criminal history involving allegations of possession of a controlled substance and domestic violence. Since beginning to cooperate with law enforcement, CS1 has provided timely, reliable information to law enforcement in this investigation and other unrelated investigations. The information provided by CS1 has been corroborated by physical surveillance, consensual recordings, and information from other law enforcement officers. Based on law enforcement dealings with CS1 and the information provided in this Affidavit, I consider CS1 to be credible and believe that the information provided by CS1 is reliable.

603-7907 to speak with CS1. According to CS1, CS1 told NUNEZ ROCHELL that CS1 intended to sell the heroin to a customer for $55,000.

6.     On January 9, 2018, CS1 received a text message from (815) 603-7907 that read "46." According to CS1, based on prior conversations with NUNEZ ROCHELL, s/he understood "46" to mean that NUNEZ ROCHELL would sell CS1 two kilograms of heroin for $46,000 per kilogram. CS1 replied to NUNEZ ROCHELL via text at (815) 603-7907, "ok perfect."

7.     On January 12, 2018, agents showed a photograph of NUNEZ ROCHELL from Illinois Secretary of State records to CS1. CS1 positively identified NUNEZ ROCHELL as the individual CS1 knows as "Javier Cabrales." According to Illinois Secretary of State records, NUNEZ ROCHELL has a listed address on the 5200 block of South Maplewood Avenue in Chicago (the "Maplewood Residence"). CS1 told agents that NUNEZ ROCHELL worked at a restaurant/bar located on the 2500 block of West 51st Street in Chicago (the "Bar"), which is approximately one block away from the Maplewood Residence.

8.     On January 16, 2018, CS1 called and spoke to NUNEZ ROCHELL at (815) 603-7907.[2] According to CS1, CS1 and NUNEZ ROCHELL agreed to meet the

---

[2] The calls, text messages, and meetings between CS1 and those involved in this transaction were recorded, but are in Spanish. I have not reviewed the recordings, and the information about these calls is based on information provided to me by CS1 who participated in these conversations. In addition, the summaries of conversations contained in this affidavit may not represent the entire conversation that occurred between the identified individuals. My understanding and/or interpretation of these conversations is based on information received from law enforcement personnel, my knowledge derived from this investigation, and my experience and familiarity with narcotics trafficking.

following day to finalize the details of CS1's purchase of heroin. They agreed to meet at 11:00 a.m. at a juice bar located near the Bar and the Maplewood Residence.

9. On January 17, 2018, at 11:32 a.m., CS1 called and spoke to NUNEZ ROCHELL at (815) 603-7907. According to CS1, NUNEZ ROCHELL directed CS1 to meet him in the alley behind the Maplewood Residence, and CS1 told NUNEZ ROCHELL s/he was on his/her way.

10. At approximately 11:50 a.m., agents surveilling the Maplewood Residence saw CS1 arrive and park in the alley. Shortly after CS1's arrival, agents observed NUNEZ ROCHELL exit the Maplewood Residence and get into CS1's vehicle. According to CS1, CS1 and NUNEZ ROCHELL talked in CS1's car during this time, and at approximately 12:18 p.m., law enforcement agents observed NUNEZ ROCHELL exit CS1's car and walk back inside the Maplewood Residence. CS1 drove away after NUNEZ ROCHELL went inside the residence.

11. During the conversation between CS1 and NUNEZ ROCHELL, they agreed to meet again on January 18, 2018, at the Bar. According to CS1, NUNEZ ROCHELL stated he wanted to meet in the basement of the Bar because it was the first time doing a drug transaction with CS1's customer, and NUNEZ ROCHELL wanted to play it safe. According to CS1, NUNEZ ROCHELL told CS1 that he stored the drugs at a "lady's house" that was a block or two away from the Bar. According to CS1, NUNEZ ROCHELL asked CS1 to give him two hours' notice so that he could retrieve the drugs and bring them to the Bar sometime in the afternoon. According to CS1, CS1 told NUNEZ ROCHELL that CS1 was going to bring his/her customer to

the Bar, and NUNEZ ROCHELL said they could check out the drugs by opening the package and making sure it was what they wanted. According to CS1, CS1 told NUNEZ ROCHELL that CS1 would then get the money to pay NUNEZ ROCHELL from CS1's car. According to CS1, NUNEZ ROCHELL stated words to the effect that this would be quick and easy, and that both CS1 and NUNEZ ROCHELL would each make a little over four thousand dollars. According to CS1, NUNEZ ROCHELL told CS1 that the heroin was brown, meaning very strong, and that CS1 would need to cut or dilute it with other substances.

12.     On January 18, 2018, at approximately 12:13 p.m., CS1 placed a recorded call to NUNEZ ROCHELL at (815) 603-7907. During the call, CS1 told NUNEZ ROCHELL that CS1 and his/her customer would be at the Bar around 1:30 p.m.

13.     On January 18, 2018, at approximately 1:40 p.m., agents saw a white Chevrolet Avalanche leave from the alley behind the Maplewood Residence. The Avalanche drove to a parking lot adjacent to a beauty salon (the "Salon") on the 2500 block of 51st Street in Chicago, which is less than one block from the Bar. At approximately 1:43 p.m., agents observed NUNEZ ROCHELL exit the Avalanche and enter the Salon. At approximately 1:55 p.m., agents saw NUNEZ ROCHELL walk out of the Salon with his left hand in his left jacket pocket.

14.     At approximately 1:55 p.m., CS1 placed a recorded call to NUNEZ ROCHELL and let him know they had arrived at the Bar. A DEA Special Agent working in an undercover capacity ("UC") accompanied CS1 and posed as CS1's

customer. The UC was wearing a recording device. According to the UC, NUNEZ ROCHELL, CS1, and the UC met outside the Bar. The UC immediately noticed that NUNEZ ROCHELL had his left hand in his left jacket pocket, and kept it there as they entered the Bar together. NUNEZ ROCHELL led CS1 and the UC through the Bar and through a door leading outside. According to the UC, once outside, NUNEZ ROCHELL walked down a flight of stairs leading to a door that he opened with a key. According to the UC, NUNEZ ROCHELL told CS1 and the UC to go down to the door. CS1 went into the door to the basement with NUNEZ ROCHELL while the UC waited outside. According to the UC, when they came back upstairs and into the Bar, CS1 told the UC they were good, but that NUNEZ ROCHELL had to go somewhere. According to the UC, CS1 and the UC stayed in the Bar, and NUNEZ ROCHELL walked away.

15.    According to the UC, after NUNEZ ROCHELL walked out of the Bar, CS1 told the UC that NUNEZ ROCHELL had pulled a package that appeared to be one kilogram of heroin out of his jacket and showed it to CS1. According to the UC, CS1 said NUNEZ ROCHELL left the suspected kilogram of heroin in a box in the basement, and NUNEZ ROCHELL said he was going to go to get the second kilogram. The UC informed agents surveilling the Bar to observe NUNEZ ROCHELL and stop him as NUNEZ ROCHELL returned to the Bar.

16.    At approximately 2:03 p.m., agents observed NUNEZ ROCHELL exit the Bar and walk to the Salon. NUNEZ ROCHELL was inside the Salon for only a few minutes before he came out and walked with both hands in his jacket pockets

towards the Bar. Agents approached NUNEZ ROCHELL to stop him. As they approached, NUNEZ ROCHELL dropped what appeared to be package containing a kilogram of heroin to the ground.

17.     Agents placed NUNEZ ROCHELL under arrest at 2:05 p.m. and recovered the suspected kilogram of heroin from the ground. The package weighed approximately 1051.6 grams and field-tested positive for the presumptive presence of heroin.

18.     NUNEZ ROCHELL told agents that his wife owns the Salon, and that there is an additional half kilogram of heroin in the Salon. NUNEZ ROCHELL consented in writing to a search of the Chevrolet Avalanche, the Salon, and the Maplewood Residence. NUNEZ ROCHELL led agents into the Salon basement and directed them to what appeared to be a half kilogram of heroin secreted in the ceiling above a water heater. The substance weighed approximately 578.7 grams and field-tested positive for the presumptive presence of heroin. Using NUNEZ ROCHELL's keys, agents recovered the suspected kilogram of heroin from the basement of the Bar. The substance weighed approximately 1062.8 grams and field-tested positive for the presumptive presence of heroin.

19.     Based on the foregoing, I believe there is probable cause to believe that NUNEZ ROCHELL knowingly and intentionally possessed with intent to distribute one kilogram or more of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

ALISON TEEVAN
Task Force Officer, Drug Enforcement
Administration

SUBSCRIBED AND SWORN to before me on January 19, 2018.

MICHAEL T. MASON
United States Magistrate Judge